## UNITED STATES DISTRICT COURT EASTERN DISTRICT OF MICHIGAN SOUTHERN DIVISION

BRIAN ROSS, an Individual,
FARAH GLASSTETTER, an Individual, and
SARAHCONQUEST, an Individual

|                                          |                                                                                    |
| ---------------------------------------- | ---------------------------------------------------------------------------------- |
| Plaintiffs,                              | Case No: 2:23-cv-12754<br>Honorable:<br>Magistrate:                                |

v.

CITY OF BURTON, a Governmental Entity
POLICE OFFICERS LABOR COUNCIL –
BURTON CITY COMMAND OFFICERS,
POLICE OFFICERS LABOR COUNCIL –
BURTON PATROL OFFICERS,
DUANE HASKINS, in his Official Capacity Only
TINA CONLEY, KEVIN JONES,
KEVIN KISSEL and DANA PIAZZA,
in their Individual and Official Capacities,
Jointly and severally.

Defendants.
_____

MUNEEB M. AHMAD (P70391)
SYED HUSSAIN AKBAR (P67967)
AHMAD & AKBAR LAW, PLLC
Attorneys for Plaintiffs
811 N. Main Street, Suite 106
Royal Oak, MI 48067-1825
Tel. (248) 519-2313
Fax: (248) 519-2399
_____

## PLAINTIFFS' VERIFIED COMPLAINT
_____

*10.30.23 Plaintiffs' Verified Complaint and Jury Demand, p. 1*

There is another pending civil action arising out of the
transactions or occurrences alleged in this Complaint in
the United States Eastern District of Michigan, Southern
Division before the Honorable Matthew F. Leitman
under Case No.: 4:23-cv-12272-MFL-EAS.

**NOW COME**, Plaintiffs BRIAN ROSS, an Individual, FARAH

GLASSTETTER, an Individual, and SARAH CONQUEST, an Individual by and

through their undersigned counsel, AHMAD & AKBAR LAW, PLLC, and for their

Complaint against Defendants CITY OF BURTON, a Municipal Corporation,

POLICE OFFICERS LABOR COUNCIL–BURTON CITY COMMAND

OFFICERS, a Labor Union, POLICE OFFICERS LABOR COUNCIL–BURTON

PATROL OFFICERS, a Labor Union, DUANE HASKINS, Mayor of the City of

Burton, in his Official Capacity Only, TINA CONLEY, a City Councilwoman for

the City of Burton, in her Individual and Official Capacity, KEVIN JONES, a Police

Officer for the City of Burton, in his Individual and Official Capacity, KEVIN

KISSEL, a Police Officer for the City of Burton, in his Individual and Official

Capacity, and DANA PIAZZA, a Police Officer for the City of Burton, in her

Individual and Official Capacity, Jointly and Severally, hereinafter state as follows:

## PARTIES

### PLAINTIFF PARTIES

1.      At all times relevant herein, Plaintiff, BRIAN ROSS (hereinafter referred to as "Ross"), was, and still is, an individual who is resident of a municipality within the County of Genesee, State of Michigan.

2.      At all times relevant herein, Plaintiff, FARAH GLASSTETTER (hereinafter referred to as "Glasstetter"), was, and still is, an individual who is resident of a municipality within the County of Genesee, State of Michigan.

3.      At all times relevant herein, Plaintiff Glasstetter was, and still is an African-Arab American Muslim Female of Moroccan descent.

4.      At all times relevant herein, Plaintiff, SARAH CONQUEST (hereinafter referred to as "Conquest"), was, and still is, an individual who is resident of a municipality within the County of Genesee, State of Michigan.[1]

5.      At all times relevant herein, Plaintiff Conquest was, and still is an Asian-American Homosexual Female.

### DEFENDANT PARTIES

6.      Upon information and belief, at all times relevant herein, Defendant, CITY OF BURTON (hereinafter referred to as the "City") was, and still is, a Michigan

---

[1] Plaintiffs Ross, Plaintiff Glasstetter and Plaintiff Conquest will be hereinafter collectively referred to as "Plaintiffs" throughout this pleading.

*10.30.23 Plaintiffs' Verified Complaint and Jury Demand, p. 3*

municipal corporation that exists by virtue of the laws of and within the State of Michigan, within the County of Genesee, with a principal place of business located at 4303 South Center Road, Burton, Michigan 48519.

7.     Defendant City runs, operates and is in charge of the City of Burton's Police Department, (hereinafter referred to as the "Police Department" or "Department") which was, and still is, a department of the City, operating as a law enforcement agency with a principal place of business located at 4090 Manor Dr, Burton, Michigan 48519.

8.     Upon information and belief, at all times relevant herein, Defendant POLICE OFFICERS LABOR COUNCIL—BURTON COMMAND OFFICERS GROUP (hereinafter referred to as the "BCOG") was, and still is, the labor union that represents the bargaining unit for the Detectives, Sergeants, and Lieutenants (hereinafter "Command Officers") employed by the City's Police Department.

9.     Upon information and belief, at all times relevant herein, Defendant POLICE OFFICERS LABOR COUNCIL-BURTON PATROL OFFICERS (hereinafter referred to as the "BPO") was, and still is, the union that represents the bargaining unit for all full and part-time police officers (hereinafter "Officers"), excluding all

Supervisory Personnel, the Chief of Police, Lieutenants, Sergeants, Detectives and temporary, seasonal and Reserve Officers.[2]

10.    Upon information and belief, at all times relevant herein, Defendant, DUANE HASKINS (hereinafter referred to as "Mayor Haskins"), was, and still is, an individual who is resident of a municipality within the County of Genesee, State of Michigan and is the Mayor of the City of Burton and acted pursuant to his authority on the City's behalf. Defendant Haskin is sued in his official capacity only.

11.    Upon information and belief, at all times relevant herein, Defendant, TINA CONLEY (hereinafter referred to as "Councilwoman Conley"), was, and still is, an individual who is resident of a municipality within the County of Genesee, State of Michigan and is employed by the City as a City Council Member and acted pursuant to her authority on the City's behalf. Defendant Conley is sued in her individual and official capacities.

12.    Upon information and belief, at all times relevant herein, Defendant, KEVIN JONES (hereinafter referred to as "Jones"), was, and still is, an individual who is resident of a municipality within the County of Genesee, State of Michigan and was employed by the City as a Lieutenant with the City's Police Department and acted

---

[2] Defendants BCOG Union and BPO Union will hereinafter be collectively referred to as the "*Defendant Unions*" throughout this pleading.

pursuant to his authority on the City's and the Police Department's behalf. Defendant Jones is sued in his individual and official capacities.

13.    Upon information and belief, at all times relevant herein, Defendant, KEVIN KISSEL (hereinafter referred to as "Kissel"), was, and still is, an individual who is resident of a municipality within the County of Genesee, State of Michigan, and was employed by the City as a Lieutenant with the City's Police Department and is currently now a Patrol Officer and acted pursuant to his authority on the City's and the Police Department's behalf. Defendant Kissel is sued in his individual and official capacities.[3]

14.    Upon information and belief, at all times relevant herein, Defendant, DANA PIAZZA (hereinafter referred to as "Piazza"), was, and still is, an individual who is resident of a municipality within the County of Genesee, State of Michigan and was and still is employed as a Patrol Officer and acted pursuant to her authority on the

---

[3] Defendant Haskins, Defendant Jones and Defendant Kissel will be hereinafter collectively referred to as "*Defendant Command Officers Jones and Kissel*" throughout this pleading.

City's and the Police Department's behalf. Defendant Piazza is sued in her individual and official capacities.[4][5]

15.    Upon information and belief, at all times relevant herein, the Individual Defendants acted under color of state law, within the meaning of 42 U.S.C. § 1983.

16.    Upon information and belief, at all times relevant herein, Defendants are considered to be an "employer" of Plaintiffs within the meaning of Title VII, 42 U.S.C. § 2000e(f).

## JURISDICTION

17.    This Honorable Court has original jurisdiction over Plaintiffs' claims arising under 42 U.S.C. § 1983 and the Equal Protection Clause as enumerated through the 14th Amendment of the U.S. Constitution, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*.

18.    Under 28 U.S.C. § 1367, this Court also has supplemental jurisdiction over Plaintiffs' state law claims, which include, but are not limited to, the Elliott-Larsen Civil Rights Act ("ELCRA"), MCL 37.2101, and intentional infliction of mental and emotional distress laws.

---

[4] Defendant Jones, Defendant Kissel and Defendant Piazza will be hereinafter collectively referred to as "*Defendant Officers*" throughout this pleading.

[5] Defendant Conley, Defendant Jones, Defendant Kissel, and Defendant Piazza will hereinafter collectively be referred to as the "*Individual Defendants*" throughout this pleading.

*10.30.23 Plaintiffs' Verified Complaint and Jury Demand, p. 7*

19.     This Court is the proper venue pursuant to 28 U.S.C. § 1391(b) as all acts and omissions giving rise to this complaint occurred in Genesee County.

## **INTRODUCTION**

20.     It is widely accepted by scholars that police, like any organization, have an organizational culture that influences individual's beliefs and decisions. Indeed, *The President's Task Force on 21st Century Policing* from May 2015, p. 11-12, notes, that "[a]ny law enforcement agency can make great rules and policies. . . " but, "if those policies conflict with the existing culture, they will not be institutionalized and behavior will not change."

21.     Despite Defendant City's and its Police Department's policies, state law, federal law, and longstanding court precedent regarding discrimination and retaliation related to race, national origin and sex, Defendant City and its Police Department maintain a pervasive and toxic police culture that supersedes both law and behavior acceptable in a civil society such that it shocks the conscience.

22.     Indeed, upon information and belief, Defendant City, and more particularly its Police Department, has a history of discrimination and retaliation based on its customs, policies, and practices that target racial and ethnic minorities, females and/or LGBTQ police officers and employees within the Department.

23.      Those customs, policies, and practices of race discrimination, national origin discrimination, sex discrimination and retaliatory practices, which individually and

collectively constitute a moving force in the constitutional violations asserted herein,

including but not limited to:

    a.    Direct humiliating, outrageous, sexist, and belittling antagonism, discrimination, and retaliation towards members of protected classes, such as minorities, members of the LGBTQ community, and/or female officers with the Department;

    b.    Direct humiliating, outrageous, and belittling antagonism, discrimination, and retaliation towards individuals who have an association with members of protected classes, such as minorities, members of the LGBTQ community, and/or female officers with the Department;

    c.    Failure, amounting to refusal to address known complaints of discriminatory and retaliatory actions and remarks by its officers directed toward members of protected classes, such as minorities, members of the LGBTQ community, and/or female officers with the Department;

    d.    Failure, amounting to refusal to address known complaints of discriminatory and retaliatory actions and remarks by its officers directed at individuals who have an association with members of protected classes, such as minorities, members of the LGBTQ community, and/or female officers with the Department;

    e.    Failure, amounting to refusal to address known complaints of discriminatory and retaliatory actions and remarks by its officers regarding rumors of discriminatory stereotypes regarding members of protected classes, such as minorities, members of the LGBTQ community, and/or female's advancement and role in the workplace;

    f.    Failure, amounting to refusal to address known complaints of discriminatory and retaliatory actions and remarks by its officers regarding rumors of sex stereotypes regarding women's advancement and role in the workplace;

    g.    Failure, amounting to refusal to investigate and/or document complaints of discriminatory and retaliatory actions and remarks by its

officers directed at members of protected classes, such as minorities, members of the LGBTQ community, and/or female officers with the Department;

h.     Failure, amounting to refusal to discipline its officers for humiliating, outrageous, sexist, and belittling antagonism, discrimination, and retaliation towards members of protected classes, such as minorities, members of the LGBTQ community, and/or female officers with the Department;

i.     Failure, amounting to refusal to discipline its officers for engaging in discriminatory or retaliatory behavior;

j.     Failure, amounting to refusal to enforce policies and procedures for the reporting of discrimination, harassment, hostile work environment, and retaliation;

k.     Failure, amounting to refusal to enforce grievance procedures, investigation procedures, disposition procedures, disciplinary action, and training in connection with employment discrimination, harassment, hostile work environment, and retaliation;

l.     Failure to train its officers regarding humiliating, outrageous, sexist, and belittling antagonism, discrimination, retaliation towards members of protected classes, such as minorities, members of the LGBTQ community, and/or female officers with the Department;

m.     Failure to train its officers regarding humiliating, outrageous, sexist, and belittling antagonism, discrimination, retaliation towards individuals who have an association with members of protected classes, such as minorities, members of the LGBTQ community, and/or female officers with the Department;

n.     Failure to train its officers regarding rumors of discriminatory stereotypes regarding members of protected classes, such as minorities, members of the LGBTQ community, and/or female advancement and role in the workplace;

o.     Failure to train its officers regarding rumors of sex stereotypes regarding womens' advancement and role in the workplace;

p.   Failure to train its officers regarding the mandatory requirement that discriminatory and/or retaliatory actions are inexcusable and will be responded to with discipline; and

q.   Failure to train its officers regarding the use of hostile statements and verbalisms directed toward minorities, members of the LGBTQ community, and women.

24.   In direct violation of long-standing bedrock federal and state laws, Defendant City's acquiescence of the above referenced pervasive and toxic police culture, customs, policies, and practices, subjected Plaintiffs to a perverse hostile work environment based on discrimination and retaliation related to their race, national origin and sex (which, encompassed discrimination based on pregnancy status, sexual orientation, associational discrimination) at the hands of Individual Defendants, including but not limited to, inappropriate, insulting, demeaning, stereotypical, and offensive comments, jokes, statements, conversations, and other conduct, adverse employment actions, and disparate treatment:

a.   Directed towards Plaintiff Glasstetter based on her sex in connection with her pregnancy;

b.   Directed toward Plaintiff Glasstetter based on her sex in connection with the defamatory false narrative of an alleged affair between Plaintiff Ross and herself;

c.   Directed toward Plaintiff Glasstetter based on her sex in connection with her complaint and reporting of the nepotism policy being placed in her mailbox;

d.   Directed toward Plaintiff Glasstetter based on her sex in connection with Defendants' manifest indifference and failure to address Plaintiff

Glasstetter's complaint and reporting of the ongoing discrimination in a manner reasonably calculated to end the ongoing harassment by not even acknowledging or documenting or fully investigating the discrimination and harassment complaints;

e. Directed toward Plaintiff Glasstetter based on her sex in connection with her favorable Sergeant's exam results;

f. Directed toward Plaintiff Glasstetter based on her sex in connection with her promotion to the rank of Sergeant;

g. Directed towards Plaintiff Conquest based on her sex in connection with her homosexual orientation;

h. Directed towards Plaintiff Conquest based on her Asian national origin or race;

i. Directed toward Plaintiff Conquest based on her sex in connection with Defendants' manifest indifference and failure to address Plaintiff Conquest's complaint and reporting of the ongoing discrimination in a manner reasonably calculated to end the ongoing harassment by not even acknowledging or documenting or fully investigating the discrimination and harassment complaints;

j. Directed towards Plaintiff Conquest based on her sex in connection with her favorable Detective's exam results;

k. Directed towards Plaintiff Ross based on his sex in connection with the defamatory false narrative of an alleged affair between Plaintiff Glasstetter and himself;

l. Directed toward Plaintiff Ross based on his association with Plaintiffs Glasstetter and Conquest, both of whom are members of a protected class under Title VII in connection with Defendants' manifest indifference and failure to address Plaintiff Ross' complaints and reporting of the ongoing discrimination in a manner reasonably calculated to end the ongoing harassment by not even acknowledging or documenting or fully investigating the discrimination and harassment complaints; and

      m.    Directed towards Plaintiff Ross in connection with his association with Plaintiffs Glasstetter and Conquest, both of whom are members of a protected class under Title VII.

25.    As noted by researcher Sierra-Arevalo in *American Policing and the Danger Imperative*, "[P]olice see how problems shared by their fellow officers are addressed" and "come to a common understanding of solutions to problems encountered in the course of their work".

26.    Indeed, despite Plaintiffs' best efforts to address the cultural, informal policies of discrimination rampant within Defendant City's Police Department, Plaintiffs were met with direct retaliation meant to isolate them from affecting much needed change within this pervasive, toxic culture.

27.    After Plaintiffs complained about the perverse hostile work environment to which they were/are subject, in furtherance of Defendant City's acquiescence of the above referenced customs, policies, and practices, Defendant City, by and through Individual Defendants, subjected Plaintiffs to a pattern of ongoing discrimination and retaliation which included, but was not limited to:

      a.    Initiating and spreading a knowingly false and defamatory narrative aimed at undermining Plaintiffs' authority and damaging their credibility and reputation based by accusing Plaintiffs Ross and Glasstetter of engaging in an alleged inappropriate sexual relationship;

      b.    Knowingly and falsely accusing Plaintiff Ross of copyright violations resulting in Plaintiff Ross having to hire an attorney to clear his good name;

c.     Knowingly and falsely accusing Plaintiff Conquest of allegedly witnessing Plaintiff Ross engaging in an inappropriate sexual exchange with Plaintiff Glasstetter;

d.     Knowingly and falsely accusing Plaintiff Conquest of blackmailing Plaintiffs Ross and Glasstetter and allegedly conspiring with them to pass a departmental detective's exam;

e.     Knowingly and falsely accusing Plaintiff Ross of sexual harassment in the workplace;

f.     Subjecting Plaintiffs to unauthorized police surveillance in violation of departmental policies and procedures;

g.     Subjecting Plaintiffs to a months-long investigation into alleged wrongdoings based on the false accusations set forth above, which resulted in a finding that cleared Plaintiffs of any alleged wrongdoing or misconduct;

h.     Subsequently knowingly and falsely accusing Plaintiffs Ross and Glasstetter of an inappropriate relationship in city council meetings; and

i.     Knowingly and falsely accusing Plaintiff Glasstetter of inappropriate conduct toward Defendant Councilwoman Connley to subject Plaintiff Glasstetter to unwarranted disciplinary action, *after* Plaintiffs engaged in a protected activity by reporting the rampant and perverse discrimination, ongoing hostile environment and continuous retaliation to the Equal Employment Opportunity Commission.

28.    Indeed, the retaliatory behavior set forth herein by Defendant Councilwoman Conley, Defendant Command Officers Jones and Kissel, and Defendant Piazza, is indicative of a widespread, cultural policies of discrimination and retaliation that was sanctioned by the inaction Defendant City by and through Defendant Haskins as the Mayor and final policy maker.

29.    Equally outrageous, Defendant Unions, as a collective of all officers within Defendant City's Police Department, were not only aware of the pervasive, toxic culture within Defendant Department, but also acted as the collective that created this pervasive, toxic culture and the specific discriminatory and retaliatory behavior set forth herein by Defendant Command Officers Jones and Kissel, and Defendant Piazza, such that Defendant Unions sanctioned this conduct through their blatant refusal and inaction to address the discrimination and retaliatory practiced brought to light by Plaintiffs.

30.    It is clear that this pervasive and toxic police culture and the customs, policies, and practices of discrimination based on race, national origin, and sex, and the retaliatory customs in response to the reporting of this discrimination, constitute a moving force for the constitutional violations asserted herein as evidenced by:

  a.    Disparaging and insulting comments as well as sexually discriminatory, retaliatory, and defamatory false narratives by Defendant Command Officers Jones and Kissel, and other command officers, and members of the City Council, including specifically, Defendant Councilwoman Connley;

  b.    Complaints filed with the Police Department and Defendant City and through complaints made against the Police Department and Defendant City by and through the Equal Employment Opportunity Commission ("EEOC");

  c.    Defendant City's manifestation of a deliberate indifference or unreasonableness in addressing the discriminatory conduct in light of the totality of the circumstances; and

d.  Defendant City's failure to correct, discipline, retrain, and/or supervise the Individual Defendants and the Department despite knowledge provided to the highest level and final policymakers with Defendant City.

31.  As a direct and proximate result of Defendants' individual and collective actions, Plaintiffs have suffered and continue to suffer damages.

32.  By way of this instant action, Plaintiffs hereby seek economic damages which include, but are not limited to:

a.  Economic damages such as general damages, loss of earnings and earning capacity, loss of career opportunities, value of benefits and work-related investments, and/or out-of-pocket damages;

b.  Special damages such as exemplary damages in the form of non-economic damages, which include, but are not limited to loss of goodwill, harm to reputation, loss of standing in the law enforcement community, mental and emotional distress, loss of ordinary pleasures of life, loss of confidence, sleepless nights, loss of self-esteem and confidence, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, shame, and embarrassment;

c.  Exemplary and/or punitive damages for injury not capable of precise computation resulting from Defendants' malicious actions as further outlined and set forth above;

d.  Consequential damages;

e.  Incidental damages;

f.  Applicable Statutory damages; and

g.  Special damages and/or consequential damages in the form of costs and attorney fees.

## FACTUAL ALLEGATIONS

33.     Plaintiff Ross was recruited by Defendant Haskins, to be the Chief of Police for Defendant City and has worked in this capacity since 2019.

34.     Plaintiff Ross was not initially accepted as the Police Chief by the Individual Defendants and others within the Department.

35.     Upon information and belief, this was because of a belief, promulgated by the previous police chief, that if a police chief was not appointed from within the police department and an outsider (such as Plaintiff Ross) was brought in, the Department would lose its autonomy and turn into a pseudo-branch of the sheriff's department.

36.     Nonetheless, prior to learning of their tendency to manipulate and lie, Plaintiff Ross initially promoted Defendant Command Officers Jones and Kissel on the belief that they could properly and fairly lead the Department and would ensure that all members of the Department were treated fairly and equally.

37.     Upon information and belief, throughout the history of the Police Department, detectives, sergeants, and lieutenants (hereinafter collectively referred to as "command officers" or the "command") controlled the internal day-to-day operations of the Department, while the chief worked on external affairs and was not involved in day-to-day operations or the internal affairs.

38.     However, after being appointed Chief of the Police Department, Plaintiff Ross sought to change the culture and wanted to be more involved in the overall

operations of the Department, manage and run internal affairs, and be more present in the office.

39.    Upon information and belief, this frustrated Defendant Officers who wanted to keep the power the historical operational structure of the Department.

40.    Upon information and belief they enjoyed the power that control over operations and management gave them. Consequently, Defendant Officers began having issues with Plaintiff Ross because he wanted to implement new programs for officers, such as awards ceremonies and a Community Liaison position he created within the Department to help with community outreach.

41.    Further, it quickly became well understood by Plaintiffs that Defendant Command Officers Jones and Kissel, as well as others within the Department had a discriminatory animus towards women and did not believe that women belonged in command positions in the department.

42.    Indeed, upon information and belief, Defendant Command Officers Jones and Kissel as well as Defendant City were the subject of a prior discrimination and retaliation complaint filed with the Equal Employment Opportunity Commission by another female police officer who was promoted to the rank of sergeant after passing a sergeant's exam and whom Defendant Command Officers Jones and Kissel pushed to have fired.

43.    To this end, Defendant Command Officers Jones and Kissel, as well as other male Officers took issue with Plaintiff Ross working closely with Plaintiff Glasstetter, a Minority American Muslim Moroccan Female Police Officer, and Plaintiff Conquest, a Minority American Asian Lesbian Female Police Officer.

### DISCRIMINATORY ANIMUS TOWARDS PLAINTIFF GLASSTETTER'S SEX AND PREGNANCY STATUS

44.    Sometime in March 2021, the previous Community Liaison Officer, Marshal Sabourin, was promoted to detective.

45.    Exercising his powers as the Chief of Police, Plaintiff Ross appointed Plaintiff Glasstetter, then twenty-one weeks pregnant, as the new Community Liaison Officer.

46.    At that time, in addition to her duties as a Community Liaison Officer, Plaintiff Glasstetter also maintained her existing road-patrol duties.

47.    Subsequently however, sometime in May 2021, due to her pregnancy, Plaintiff Glasstetter was moved from her road-patrol duties to office duties and given an office inside the Department.

48.    Thereafter, Plaintiff Glasstetter took maternity leave and gave birth to her child.

49.    After Plaintiff Glasstetter returned from maternity leave, Plaintiff Ross allowed her to keep her office so that Plaintiff Glasstetter could have a safe and private location to nurse and pump breast milk for her newborn infant child.

50.    Upon information and belief, Plaintiff Glasstetter's pregnancy related accommodations were widely known throughout the Department and were met with disdain from Officers within the Department.

51.    Amazingly, and upon information and belief, Defendant Officers felt that Plaintiff Glasstetter was getting preferential treatment because 1) she was allowed time to pump breast milk, and 2) was given a private setting to do so.

52.    To this end, and against the backdrop of Defendant Command Officers Jones' and Kissel's discriminatory animus towards women, Plaintiff Glasstetter was subjected to discriminatory comments related to her pregnancy, to wit:

    a.    At a meeting, one command officer smugly announced to everyone present (referring to Plaintiff Glasstetter), "*I guess we can't all take a break every 3 hours to pump*", and

    b.    Another patrol officer sent a message to members of the Department stating, "*I guess Glasstetter has to go drain her boobs or something.*"

53.    Upon information and belief, Defendant Command Officers Jones' and Kissel were well aware of this above mentioned discriminatory and/or retaliatory conduct and at least implicitly authorized, approved, or knowingly acquiesced in the conduct thereby encouraging it and/or in some other way directly participated in it by among other things:

    a.    Failing to address, investigate, or document the above mentioned discriminatory and/or retaliatory conduct,

    b.    Failing to enforce Defendant City's and Department's grievance procedures, investigation procedures, disposition procedures in

connection with above mentioned discriminatory and/or retaliatory conduct,

c.    Failing to issue any disciplinary actions in connection with above mentioned discriminatory and/or retaliatory conduct; and

d.    Failing to train the Department and Officers in connection with above mentioned discriminatory and/or retaliatory conduct.

### DISCRIMINATORY ANIMUS TOWARDS PLAINTIFF CONQUEST'S NATIONAL ORIGIN, RACE AND SEXUAL ORIENTATION

54.    Upon information and belief, it was well known to Defendants that Plaintiff Conquest was of Asian and was a Lesbian.

55.    To this end, and against the backdrop of Defendant Command Officers Jones' and Kissel's discriminatory animus towards women, Plaintiff Conquest was also subjected to open discrimination as early as 2021, wherein a sergeant openly referred to her as a "*Gaysian*", a term directly aimed to target Plaintiff's Asian origins and lesbian sexual orientation.

56.    After hearing about this incident Plaintiff Ross immediately initiated an investigation and interviewed Plaintiff Conquest.

57.    Despite her fear of retaliation, given that upon information and belief, Defendant Command Officer Jones and Kissel were personal friends with the sergeant who made the derogatory comment, Plaintiff Conquest reported this incident to Plaintiff Ross, and was assured that she would not be retaliated against and would not be subjected to discrimination moving forward.

58.    Subsequently however, Plaintiff Conquest was again targeted for her sexual orientation when during Department roll call, Officers were making fun of her and her sexual orientation and questioning how anyone didn't know that Plaintiff Conquest was a lesbian, while another sergeant even used the word "*Faggot*" in Plaintiff's presence.

59.    Plaintiff Conquest understood that given the ongoing discriminatory conduct to which she was still subject, despite the prior investigation and reporting, it was futile to further complain about these issues and matters, fearing more retaliation.

60.    Indeed, Plaintiff Conquest feared more frequent retaliation and simply tried to ignore the discriminatory statements being made by her co-workers and supervisors.

61.    Upon information and belief, Defendant Command Officers Jones' and Kissel were well aware of this above mentioned discriminatory and/or retaliatory conduct and at least implicitly authorized, approved, or knowingly acquiesced in the conduct thereby encouraging it and/or in some other way directly participated in it by among other things:

    a.    Failing to address, investigate, or document the above mentioned discriminatory and/or retaliatory conduct,

    b.    Failing to enforce Defendant City's and Department's grievance procedures, investigation procedures, disposition procedures in connection with above mentioned discriminatory and/or retaliatory conduct,

c.     Failing to issue any disciplinary actions in connection with above mentioned discriminatory and/or retaliatory conduct; and

d.     Failing to train the Department and Officers in connection with above mentioned discriminatory and/or retaliatory conduct.

**DEFENDANT COMMAND OFFICERS JONES' AND KISSEL'S AND OFFICER PIAZZA'S SEXUALLY DISCRIMINATORY AND RETALIATORY DEFAMATORY FALSE NARRATIVE OF AN ALLEGED AFFAIR BETWEEN PLAINTIFFS ROSS AND GLASSTETTER**

62.    Upon information and belief, it was no secret that as the Community Liaison Officer, Plaintiff Glasstetter worked closely with and reported directly to Plaintiff Ross as the Chief of Police.

63.    Upon information and belief, on or about December 17, 2022, the Detroit Red Wings were hosting a hockey game in recognition of local law enforcement.

64.    Upon information and belief, Defendant Officers and others, including Plaintiff Glasstetter's husband, Officer Cameron Glasstetter (hereinafter referred to as "Cameron") attended the game, whereafter, Plaintiff Conquest was planning to propose to her girlfriend.

65.    Plaintiff Ross was seated between Cameron and Defendant Piazza's boyfriend at the game, during which Plaintiffs were all texting amongst each other in a group chat and were discussing Plaintiff Conquest's anticipated post-game proposal.

66.    Upon information and belief, Defendant Piazza allegedly saw these messages and knowingly and falsely claimed that Plaintiffs Ross and Glasstetter were "*sexting*" each other.

*10.30.23 Plaintiffs' Verified Complaint and Jury Demand, p. 23*

67.   After the event, Plaintiffs, Defendant Officers, Cameron and others all went to Campus Martius for the proposal and then to a local bar.

68.   In addition to the false allegation by Defendant Piazza, upon information and belief Defendant Officers also alleged that Defendant Ross had a physical altercation with Cameron and had gotten into a fight with him.

69.   Upon information and belief, these false allegations by Defendant Officers were part of a sexually discriminatory, retaliatory, and defamatory false narrative of an alleged affair between Plaintiffs Ross and Glasstetter in order to undermine Plaintiffs Ross' and Glasstetter's authority and disparage their reputation and good name in the community.

70.   Indeed, approximately one week later, on or about December 24, 2022, Cameron specifically told Plaintiff Glasstetter and her Father that Defendant Command Officer Jones and another sergeant told him, that Plaintiff Glasstetter was allegedly cheating on him with Plaintiff Ross.

71.   Upon information and belief, Defendant Command Officers Jones' and Kissel were well aware of this above mentioned discriminatory and/or retaliatory conduct and at least implicitly authorized, approved, or knowingly acquiesced in the conduct thereby encouraging it and/or in some other way directly participated in it by among other things:

   a.   Failing to address, investigate, or document the above mentioned discriminatory and/or retaliatory conduct,

*10.30.23 Plaintiffs' Verified Complaint and Jury Demand, p. 24*

b.    Failing to enforce Defendant City's and Department's grievance procedures, investigation procedures, disposition procedures in connection with above mentioned discriminatory and/or retaliatory conduct,

c.    Failing to issue any disciplinary actions in connection with above mentioned discriminatory and/or retaliatory conduct; and

Failing to train the Department and Officers in connection with above mentioned discriminatory and/or retaliatory conduct.

**DEFENDANT COMMAND OFFICERS JONES AND KISSEL RETALIATE AGAINST PLAINTIFF ROSS FOR INVESTIGATIONS INTO DISCRIMINATION BY ACCUSING HIM OF ALLEGED COPYRIGHT VIOLATIONS RELATED TO DEPARTMENTAL EXAMS**

72.    Upon information and belief, the collective bargaining agreement had changed the eligibility requirement to take the Sergeant's exam from five years of experience to three years because there were only a few officers eligible under the previous guidelines.

73.    To this end, upon information and belief, rumors of a Sergeant's exam began spreading in late November or early December of 2021, followed by a formal announcement of the exam sometime in January 2023.

74.    In addition, a Detective's exam was also announced around this time.

75.    It was common knowledge that the prior Sergeant's exams were based on the Michigan law book, Police Department policies, and another book chosen by the chief, all of which were available for purchase on Amazon.

76.   To this end, Plaintiff Glasstetter, began studying for the exam at home with her father from the books that she purchased from Amazon.

77.   As such, upon information and belief, Cameron told members of the Department that Plaintiff Glasstetter was studying for the exam early.

78.   Against the backdrop of Defendant Command Officers Jones' and Kissel's discriminatory animus towards women in command, as well as Defendant Command Officer Jones' and the other sergeant's initiation of rumors of an alleged affair between Plaintiffs Ross and Glasstetter, Defendant Command Officers Jones and Kissel used this disclosure by Plaintiff Glasstetter's husband, Cameron, to further stoke the flames of their knowingly false narrative of an affair to further damage Plaintiff Ross' and Plaintiff Glasstetter's reputation by baselessly claiming that:

    a.   Plaintiff Ross switched the eligibility requirements solely to promote Plaintiff Glasstetter to the rank of sergeant; and

    b.   Plaintiff Ross provided Plaintiff Glasstetter the books, exam questions, and other resources in order to help her pass the exam.

79.   Upon information and belief, Defendant Command Officers Jones' and Kissel's baseless claims had the intended consequence of giving Officers and others the appearance of impropriety that Plaintiff Ross had provided Plaintiff Glasstetter some sort of preferential treatment as it pertained to the upcoming Sergeant's exam.

80.   As such, and in furtherance of their discriminatory animus towards women in command, Defendant Command Officers Jones and Kissel insisted on hiring an

external company to administer the Sergeant's exam in the hopes this would somehow prevent Plaintiff Glasstetter from passing and joining the ranks as a command officer.

81.   Although the administration of the Sergeant's exam by an external company would cost approximately $4,000.00, Plaintiff Ross agreed to use the company to avoid further speculation on his alleged preferential treatment of Plaintiff Glasstetter and dispel the rumors of his alleged affair with her.

82.   Relative to the detective's exam, upon information and belief, Defendant Command Officers Jones and Kissel wanted to ensure that this open command position would go to one of their male counter-parts, and insisted to Plaintiff Ross that they could write the Detective's exam internally instead of hiring an external company because, unlike the sergeant's test, Defendant Command Officers Jones and Kissel knew that Plaintiff Glasstetter was not planning on taking the detective's exam.

83.   However, notwithstanding Defendant Command Officers Jones' and Kissel's preparation of their own detective's exam, Plaintiff Ross wrote and administered his own version of the detective's exam, which infuriated Defendant Command Officers Jones.

84.   Plaintiff Ross used information from a website, Policecareers.com, in part of the Detective's exam he wrote.

*10.30.23 Plaintiffs' Verified Complaint and Jury Demand, p. 27*

85.    In fact, Defendant Command Officer Jones' reaction to the use of another detective's exam prepared by Plaintiff Ross, instead of the exam prepared by Defendant Command Officers Jones and Kissel, was so intense that Plaintiff Ross considered firing Defendant.

86.    However, in an effort to appease Defendant Command Officers Jones and Kissel, Plaintiff Ross offered to hire an external company to administer the detective's exam, which Defendant Command Officers Jones and Kissel refused.

87.    Upon information and belief, in retaliation for Plaintiff Ross' support of a discrimination free workplace, his support of women in the command unit, and his investigations into command officers' discrimination against Plaintiff Conquest, in furtherance of their attempt to undermine his authority and credibility and to tarnish his good name and reputation within the community, Defendant Command Officers Jones and Kissel unilaterally, and without the knowledge or consent of their superior, contacted Policecareers.com and encouraged its owners to press copyright violation charges against Plaintiff Ross.

88.    This forced Plaintiff Ross to incur the expense of hiring an attorney to resolve the issue with Policecareers.com, who amicably resolved any issues and confirmed no wrongdoing on the part of Plaintiff Ross.

89.    Upon information and belief, Defendant Command Officers Jones' and Kissel were well aware of this above mentioned discriminatory and/or retaliatory conduct

and at least implicitly authorized, approved, or knowingly acquiesced in the conduct

thereby encouraging it and/or in some other way directly participated in it by among

other things:

    a.    Failing to address, investigate, or document the above mentioned discriminatory and/or retaliatory conduct,

    b.    Failing to enforce Defendant City's and Department's grievance procedures, investigation procedures, disposition procedures in connection with above mentioned discriminatory and/or retaliatory conduct,

    c.    Failing to issue any disciplinary actions in connection with above mentioned discriminatory and/or retaliatory conduct; and

    d.    Failing to train the Department and Officers in connection with above mentioned discriminatory and/or retaliatory conduct.

### DEFENDANT COMMAND OFFICERS JONES' AND KISSEL'S CONTINUED DISCRIMINATION AND RETALIATION AGAINST PLAINTIFFS

90.    Upon information and belief, on March 31, 2022, the Sergeant's exam results

were released and thereafter posted on April 5, 2022, thereby revealing to the

Department that Plaintiff Glasstetter had passed the exam.

91.    Moreover, Plaintiff Conquest also passed the Detective's exam.

92.    Upon information and belief, Defendant Command Officers Jones and Kissel,

as well as others in the Department met Plaintiffs Conquest's and Glasstetter's

favorable exam results with disdain.

93.    As such, upon information and belief, in order to undermine these exam

results and to further discriminate and retaliate against Plaintiffs, in further attempt

to manufacture additional animosity and strife within the Department aimed at undermining Plaintiffs' authority and to further disparage and tarnish their reputations and good names in the community, Defendant Command Officers Jones and Kissel increased their naked animosity towards Plaintiffs by spreading lies about Plaintiff Conquest and enhanced their sexually discriminatory, retaliatory, and defamatory false narrative of an alleged affair between Plaintiffs Ross and Glasstetter, by knowingly and falsely claiming that:

a.   Plaintiff Conquest allegedly witnessed Plaintiff Ross engaging in an inappropriate sexual exchange with Plaintiff Glasstetter;

b.   Plaintiff Conquest allegedly blackmailed Plaintiffs Ross and Glasstetter to obtain a promotion to the rank of detective;

c.   Plaintiff Conquest allegedly conspired with Plaintiffs Ross and Glasstetter to ensure that she would pass the detective's exam; and

Plaintiff Conquest allegedly cheated on the detective's exam because she scored 84% on the test and was in the top 3 of all the candidates that took the exam.

94.   Incidentally, however, Defendant Command Officers Jones and Kissel never questioned the integrity of another similarly situated heterosexual Caucasian male Sergeant that scored 100% on the Detective's exam.

95.     This individual's results were openly accepted and never questioned.

96.     His promotion was met by Defendant Command Officers Jones and Kissel's approval.

97.     Upon information and belief, Defendant Command Officers Jones' and Kissel were well aware of this above mentioned discriminatory and/or retaliatory conduct and at least implicitly authorized, approved, or knowingly acquiesced in the conduct thereby encouraging it and/or in some other way directly participated in it by among other things:

      a.    Failing to address, investigate, or document the above mentioned discriminatory and/or retaliatory conduct,

      b.    Failing to enforce Defendant City's and Department's grievance procedures, investigation procedures, disposition procedures in connection with above mentioned discriminatory and/or retaliatory conduct,

      c.    Failing to issue any disciplinary actions in connection with above mentioned discriminatory and/or retaliatory conduct; and

      d.    Failing to train the Department and Officers in connection with above mentioned discriminatory and/or retaliatory conduct.

**DEFENDANT'S TURN A BLIND EYE TO PLAINTIFFS REQUEST
FOR CORRECTIVE ACTION**

98.    After the posting of the exam results, Plaintiffs Glasstetter and Conquest discovered that someone had anonymously placed a copy of the Department's nepotism policy inside Plaintiff Glasstetter's mailbox.

99.    It was obvious to Plaintiffs Glasstetter and Conquest that this was done in direct response to Defendant Command Officers Jones' and Kissel's sexually discriminatory and retaliatory defamatory false narrative of an alleged affair between Plaintiffs Ross and Glasstetter.

100.    The results of their inflammatory whisper campaign were bearing fruit.

101.    Outraged at this act, and the continued false implication it promulgated, both Plaintiff Glasstetter and Plaintiff Conquest reported this incident to Plaintiff Glasstetter's direct supervisor, who was also a Sergeant and part of the command in the Department.

102.    In response, the Sergeant indirectly implied that Plaintiff Glasstetter was somehow directly responsible for the nepotism policy being left in her mailbox and that she did something wrong and inappropriate, thereby directing her to write a report commonly referred to within the Department as a "Special", which is a

document typically written when a Department employee does something wrong or engages in some inappropriate conduct.

103.   Dissatisfied by the Sergeant's clearly manifested indifference and failure to address the complaint in a manner reasonably calculated to end the ongoing harassment, Plaintiffs Conquest and Glasstetter reported the incident to Plaintiff Ross.

104.   In response, Plaintiff Ross addressed the matter with Defendant Command Officer Jones and inquired what Defendant planned on doing about the situation.

105.   Defendant Jones openly responded that there was nothing that he could do, and subsequently did nothing.

106.   Plaintiff Ross instructed Defendant Jones multiple times to address the matter and speak to Plaintiff Glasstetter about the incident, especially considering the allegations in the previously filed EEOC complaint wherein it was alleged by another female Sergeant that the Department's command officers failed to properly investigate or document her discrimination and retaliation complaints.

107.   After multiple conversations about this matter, Defendant Command Officer Jones finally acquiesced to Plaintiff Ross' demands and discussed the matter with Plaintiff Glasstetter, during which he questioned Plaintiff Glasstetter as to why she believes someone would leave the nepotism policy in her mailbox and asked whom she was accusing.

108.   In response:

    a.    Plaintiff Glasstetter explained that she did not know who put the nepotism policy in her mailbox but further went on to explain that it was obvious that it was done in direct response to sexually discriminatory and retaliatory defamatory false narrative of an alleged affair between her and Plaintiffs Ross and claims that she was receiving preferential treatment by Plaintiff Ross in connection with the her preparation for the Sergeant's exam;

    b.    Plaintiff Glasstetter further explained that in some countries she would have been "stoned for having an affair and he [Plaintiff Ross] would have had to marry me to save my honor."

    c.    Plaintiff Glasstetter went on to further explain how the sexually discriminatory and retaliatory defamatory false narrative of an alleged affair between her and Plaintiffs Ross have made 1) made her workplace hostile and 2) made it to her home and has caused marital, social, and religious problems with her family.

109.   In response, like the other command officer, whom Plaintiffs Glasstetter and Conquest reported this incident, Defendant Command Officer Jones was also dismissive of Plaintiff's complaints and also manifested an indifference and failure to address the complaint in a manner reasonably calculated to end the ongoing harassment, to which he:

    a.    Sarcastically told Plaintiffs Glasstetter that everyone knows she studied hard and deserved the position, and that now that she was a Sergeant, she should expect nit picking and bullying and that there was little that could be done about it; and

    b.    Failed to even document the discrimination complaints or his efforts to investigate the same.

110. Upon information and belief, after this meeting, Defendant Command Officer Jones contacted Defendant Kissel, who was the president of Defendant BCOG and disclosed Plaintiffs' discrimination and sexual harassment complaints.

111. Defendant Command Officer Kissel and Defendant BCOG were also dismissive of Plaintiff's complaints and also manifested an indifference and failure to address the complaint in a manner reasonably calculated to end the ongoing harassment by not even acknowledging the discrimination and harassment complaints by Plaintiff Glasstetter.

112. After being forced to wait until the completion of Defendant Command Officers Jones' and Kissel's and Defendant BCOG's so-called investigations into Plaintiffs' discrimination and sexual harassment complaints, on or about June 6, 2023, Plaintiff Ross sent an email to the entire Department announcing Plaintiff Glasstetter's promotion to the rank of Sergeant.

113. This further caused strife and ill will towards Plaintiff Glasstetter, wherein Defendant Piazza even replied to Plaintiff's Ross' email, in which she exclaimed "*Is this a fucking joke?*"

114. When subsequently questioned about this email, Defendant Piazza stated she sent the email due to the rumors about Plaintiffs Ross and Glasstetter having an affair.

115. Upon information and belief, Defendant Command Officers Jones' and Kissel were well aware of this above mentioned discriminatory and/or retaliatory conduct and at least implicitly authorized, approved, or knowingly acquiesced in the conduct thereby encouraging it and/or in some other way directly participated in it by among other things:

    a.    Failing to address, investigate, or document the above mentioned discriminatory and/or retaliatory conduct,

    b.    Failing to enforce Defendant City's and Department's grievance procedures, investigation procedures, disposition procedures in connection with above mentioned discriminatory and/or retaliatory conduct,

    c.    Failing to issue any disciplinary actions in connection with above mentioned discriminatory and/or retaliatory conduct; and

    d.    Failing to train the Department and Officers in connection with above mentioned discriminatory and/or retaliatory conduct.

### DEFENDANT COMMAND OFFICER JONES RETALIATORY AND FALSE CLAIM'S

116. After his conversation with Plaintiffs Ross and Glasstetter, and in direct retaliation against Plaintiffs and to further undermine their authority and credibility and disparage and tarnish their reputations and good names in the community, on or about May 2, 2023, Defendant Jones, took things to another level and knowingly and falsely reported Defendant Officers' sexually discriminatory and retaliatory defamatory false narrative of an alleged affair between Plaintiffs Ross and Glasstetter and Plaintiff Conquest's alleged involvement in the manufactured

*10.30.23 Plaintiffs' Verified Complaint and Jury Demand, p. 36*

scandal to Defendant Mayor Haskins, the City's Human Resources Director, the City's Prosecutor, and the City's Labor Attorney.

117.   As a result, Defendant City, by and through its Labor Attorney initiated an investigation into Defendant Jones' allegations, which lasted approximately 2 months, and that subjected Plaintiffs and Defendant Command Officers Jones and Kissel, as well as another Sergeant to hours of interviews.

118.   To further poison the well against Plaintiffs, while details of the investigation were to be kept in strict confidence, upon information and belief, Defendant Command Officers Jones and Kissel, as well as the other Sergeant involved in the investigation, intentionally leaked details of the investigation to officers in the Department and outside agencies prior to the investigation being completed thereby exacerbating the already toxic and hostile work environment to which Plaintiffs were subjected.

119.   Ultimately, after a complete and thorough investigation into the matter, by an independent third party, Plaintiffs were all cleared of any alleged wrongdoing.

120.   However, upon information and belief, the City Labor Attorney's investigation into Defendant Jones' allegations, also revealed and confirmed that:

a.      In order to bolster his and Defendant Command Officer Kissel's sexually discriminatory and retaliatory defamatory false narrative of an alleged affair between Plaintiffs Ross and Glasstetter and Plaintiff Conquest's alleged involvement in the manufactured scandal, Defendant Jones made *materially false statements* as part of the City's Labor Attorney investigation wherein he falsely stated that Plaintiff

Ross secretly went on vacation to Tennessee with Plaintiff Glasstetter and Plaintiff Conquest.

b.   Without any authorization, and upon information and belief, in violation of Department policies and procedures, and other laws, including those that protected Plaintiffs' privacy, Defendant Command Officers Jones and Kissel had been conducting surveillance of Plaintiffs since approximately November or December of 2021;

c.   Without any authorization, and upon information and belief, in violation of Department policies and procedures, and other laws, including those that protected Plaintiffs' privacy, Defendant Command Officers Jones and Kissel solicited the help of other officers to independently pull body cam footage without any probable cause, authorization, or authority;

d.   Without any authorization, and upon information and belief, in violation of Department policies and procedures, and other laws, including those that protected Plaintiffs' privacy, Defendant Jones pulled in-office surveillance videos from within the Department buildings without any authorization or authority.

## DEFENDANT COUNCILWOMAN TINA CONLEY'S CONTINUED RETALIATION ON BEHALF OF HERSELF AND THE DEFENDANT CITY

121.  Plaintiffs having officially been cleared by the City's Labor Attorney of any alleged wrongdoing, and in response to Defendant Jones' justified disciplinary action, on or about Monday, June 19, 2023, Defendant BCOG of which Defendant Kissel is the President, dispatched a letter of no confidence to the Burton City Council, wherein Defendant BCOG falsely claimed that "the BCOG membership has _unanimously approved_ a Vote of No Confidence in Burton Police Chief Brian Ross."

122.   Indeed, this vote was certainly not unanimous as Plaintiff Glasstetter, a member of Defendant BCOG was deliberately further discriminated and retaliated against as she was excluded from the vote where the decision to send the letter was made.

123.   Nonetheless, at the meeting where the Defendant's City Counsel read the letter, four of the seven members, and more specifically Defendant Councilwoman Conley, espoused open hostility towards Plaintiff Ross and Plaintiff Glasstetter and intended to fire Plaintiff Ross that night before learning that they could not.

124.   Upon information and belief, in furtherance of this retaliatory conduct, Defendant Conley further defamed Plaintiff Ross and Glasstetter wherein she claimed that she knew that Plaintiffs Chief Ross and Sgt. Glasstetter were having an affair.

125.   Further, on July 4, 2023, during a Department roll call, officers were watching a female Asian Channel 12 news reporter report the news and were mockingly attempting to pronounce the reporter's name, when an officer sarcastically stated "*Hold on, let's just refer to Sarah*" (Plaintiff Conquest) and laughed in front of a room full of officers.

126.   Again, against the historical backdrop of the discrimination Plaintiff Conquest already was forced to endure based on her national origin, gender, and sexual orientation, coupled with the sexually charged hostile environment and lies and false

narrative about her allegedly witnessing an inappropriate sexual exchange between Plaintiffs Ross and Glasstetter and rumors of her blackmailing Plaintiff Ross to pass the Detective's exam, Plaintiff Conquest found it futile to report this issue to any of the Defendants, including Defendant BPO. She felt it would go nowhere and only exacerbate her hostile workplace issues.

127.   On July 11, 2023, despite a finding in favor of Plaintiffs that cleared them of any wrongdoing and essentially disproved Defendant Officers' sexually discriminatory and retaliatory defamatory false narrative of an alleged affair between Plaintiffs Ross and Glasstetter and Plaintiff Conquest's alleged involvement in the manufactured scandal, in further retaliation, and to further disparage and tarnish Plaintiffs' reputations and good names in the community, upon information and belief, Defendant Conley stated in an open City Council meeting that she believed Defendant Jones that Plaintiffs Ross and Glasstetter were engaged in alleged sexual relationship, lending credence to Defendant Jones' already debunked retaliatory reporting to Defendant Mayor Haskins, the City's Human Resources Director, the City's Prosecutor, and the City's Labor Attorney.

128.   To further torture and retaliate against Plaintiffs and punish them for exposing Defendant Command Officers Jones and Kissel's violation of Department policies and procedures, and other laws, including those that protected Plaintiffs' privacy, Defendant Conley pushed for a second investigation to, upon information and belief,

further her political aspirations and use the sexually discriminatory and retaliatory defamatory false narrative of an alleged affair between Plaintiffs Ross and Glasstetter and Plaintiff Conquest's alleged involvement in the manufactured scandal as a platform for her bid for mayor.

129.   In light of the ongoing discrimination and retaliatory actions endured by Plaintiffs and having found no other redress, on or about October 9, 2023, Plaintiffs filed complaints and charges of discrimination against Defendant City, and Defendant Unions with the Equal Employment Opportunity Commission.

130.   After being notified of Plaintiffs' engagement in another protected activity in reporting to the EEOC, Defendant Conley swiftly retaliated against Plaintiffs and frivolously filed a manufactured complaint against Plaintiff Glasstetter in order to further intimidate, harass and retaliate against Plaintiff.

131.   On multiple occasions, on almost a daily basis since December 2021, Plaintiff Ross, as the Police Chief, specifically notified Defendant Mayor Haskins, of all of the above mentioned discriminatory and retaliatory conduct.

132.   Indeed, Defendant Mayor Haskins was well aware of this above mentioned discriminatory and/or retaliatory conduct and at least implicitly authorized, approved, or knowingly acquiesced in the conduct thereby encouraging it and/or in some other way directly participated in it by among other things:

   a.   Failing to address, investigate, or document the above mentioned discriminatory and/or retaliatory conduct,

b.     Failing to enforce Defendant City's and Department's grievance procedures, investigation procedures, disposition procedures in connection with above mentioned discriminatory and/or retaliatory conduct,

c.     Failing to issue any disciplinary actions in connection with above mentioned discriminatory and/or retaliatory conduct; and

d.     Failing to train the Department and Officers in connection with above mentioned discriminatory and/or retaliatory conduct.

## FEDERAL CLAIMS

### COUNT I
### VIOLATION OF TITLE VII, 42 U.S.C. § 2000E, *ET SEQ.*
### DISCRIMINATION BASED ON SEX AND NATIONAL ORIGIN

133.  Plaintiffs hereinafter incorporate by reference the above referenced Paragraphs and allegations, as though fully set forth herein.

134.  At all times relevant herein, there was in effect a federal statute, the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* which provides:

It shall be an unlawful employment practice for an employer –

(1)   to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2)   to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex or national origin.

42 U.S.C §2000e

*10.30.23 Plaintiffs' Verified Complaint and Jury Demand, p. 42*

135.  Discrimination based on sexual orientation is considered a form of sex discrimination and is therefore unlawful and prohibited under Title VII. See *Bostock v Clayton Co*, 140 S.Ct. 1731, 1734 (2020).

136.  Discrimination based on pregnancy is considered a form of sex discrimination and is therefore unlawful and prohibited under Title VII. See *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976).

137.  Discrimination and retaliation based on an individual's association with members of a protected class who are subjected to unlawful discrimination, is considered associational discrimination and is therefore unlawful and prohibited under Title VII. See *Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011).

138.  False rumors of an alleged affair with their superiors in the workplace pertaining to a female employee's *promotion* are inherently based on sex stereotypes regarding women's advancement and role in the workplace and are considered a form of sex discrimination and therefore unlawful and prohibited under Title VII. See *Parker v. Reema Consulting Services, Inc*., 915 F.3d 297 (4th Cir. 2019).

139.  Plaintiffs are members of protected classes under Title VII and were subjected to a hostile and abusive environment, adverse employment actions, and disparate treatment based on their protected class status. See *Burlington Industries Inc. v.*

*10.30.23 Plaintiffs' Verified Complaint and Jury Demand, p. 43*

*Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

140.   During their employment Plaintiffs were subjected to a hostile and abusive work environment permeated with discriminatory intimidation, ridicule, and insult that was, and continues to be, sufficiently severe or pervasive and continues to alter the conditions of Plaintiffs' employment, wherein the cumulated effects viewed in the totality of circumstances would be intolerable to any reasonable person in Plaintiffs position such that Defendants' conduct constitutes violations of Title VII. See *Harris v. Forklift Systems, Inc*, 510 U.S. 17 (1993); see also *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999) and *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 826 (6th Cir. 1997).

141.   Defendants' unlawful discrimination against Plaintiffs as more fully set forth above includes, but is not limited to, inappropriate, insulting, demeaning, stereotypical, and offensive comments, jokes, statements, conversations, and other conduct amounting to a severe and pervasive hostile and abusive work environment, adverse employment actions, and disparate treatment, which was:

   a.   Directed towards Plaintiff Glasstetter based on her sex in connection with her pregnancy;

   b.   Directed toward Plaintiff Glasstetter based on her sex in connection with the defamatory false narrative of an alleged affair between Plaintiff Ross and herself;

c.     Directed toward Plaintiff Glasstetter based on her sex in connection with her complaint and reporting of the nepotism policy being placed in her mailbox;

d.     Directed toward Plaintiff Glasstetter based on her sex in connection with Defendants' manifest indifference and failure to address Plaintiff Glasstetter's complaint and reporting of the ongoing discrimination in a manner reasonably calculated to end the ongoing harassment by not even acknowledging or documenting or fully investigating the discrimination and harassment complaints;

e.     Directed toward Plaintiff Glasstetter based on her sex in connection with her favorable Sergeant's exam results;

f.     Directed toward Plaintiff Glasstetter based on her sex in connection with her promotion to the rank of Sergeant;

g.     Directed towards Plaintiff Conquest based on her sex in connection with her homosexual orientation;

h.     Directed towards Plaintiff Conquest based on her Asian national origin or race;

i.     Directed toward Plaintiff Conquest based on her sex in connection with Defendants' manifest indifference and failure to address Plaintiff Conquest's complaint and reporting of the ongoing discrimination in a manner reasonably calculated to end the ongoing harassment by not even acknowledging or documenting or fully investigating the discrimination and harassment complaints;

j.     Directed towards Plaintiff Conquest based on her sex in connection with her favorable Detective's exam results;

k.     Directed towards Plaintiff Ross based on his sex in connection with the defamatory false narrative of an alleged affair between Plaintiff Glasstetter and himself;

l.     Directed toward Plaintiff Ross based on his association with Plaintiffs Glasstetter and Conquest, both of whom are members of a protected class under Title VII in connection with Defendants' manifest

indifference and failure to address Plaintiff Ross' complaints and reporting of the ongoing discrimination in a manner reasonably calculated to end the ongoing harassment by not even acknowledging or documenting or fully investigating the discrimination and harassment complaints; and

m.   Directed towards Plaintiff Ross in connection with his association with Plaintiffs Glasstetter and Conquest, both of whom are members of a protected class under Title VII.

142.   Defendants were aware, or should have been aware, of Title VII and that it is illegal to treat an employee differently because of the employee's sex, sexual orientation, national origin and/or their association with members who belong to protected classes.

143.   During Plaintiffs' employment, they were subjected to acts of discrimination based on sex, sexual orientation, national origin and/or their association with members who belong to protected classes as set forth above.

144.   This illegal discrimination based on sex, sexual orientation, national origin and/or their association with members who belong to protected classes, created a hostile and abusive work environment for Plaintiffs.

145.   Defendants' actions as set forth above were willful, intentional and/or made in reckless disregard of Plaintiff's rights.

146.   Defendants' conduct as described above constitutes a willful violation of Title VII.

147.   As a direct and proximate result of the unconstitutional acts of the Defendants

and their tortious conduct and other violations of law as alleged herein, Plaintiffs

have sustained violations of their right to equal protection of the law and continue to

sustain damages, including but not limited to:

a.   Economic damages such as general damages, loss of earnings and earning capacity, loss of career opportunities, value of benefits and work-related investments, and/or out-of-pocket damages;

b.   Special damages such as exemplary damages in the form of non-economic damages, which include, but are not limited to loss of goodwill, harm to reputation, loss of standing in the law enforcement community, mental and emotional distress, loss of ordinary pleasures of life, loss of confidence, sleepless nights, loss of self-esteem and confidence, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, shame, and embarrassment;

c.   Exemplary and/or punitive damages for injury not capable of precise computation resulting from Defendants' malicious actions as further outlined and set forth above;

d.   Consequential damages;

e.   Incidental damages;

f.   Applicable Statutory damages; and

g.   Special damages and/or consequential damages in the form of costs and attorney fees.

**WHEREFORE**, Plaintiffs hereby respectfully requests that this Honorable

Court enter a judgment in favor of Plaintiffs and against Defendants, jointly and

severally, in the total amount found to be due and owing at the time of trial, in

addition to compensatory and/or punitive damages, plus court costs, statutory

interest of twelve percent (12%) and actual attorney fees sustained in the case as well as any other further relief as may be deemed appropriate under the circumstances.

## COUNT II
## VIOLATION OF TITLE VII, 42 U.S.C. § 2000E, *ET SEQ.*
## RETALIATION

148. Plaintiffs hereinafter incorporate by reference the above referenced Paragraphs and allegations, as though fully set forth herein.

149. At all times relevant herein, there was in effect a federal statute, the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* which provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization *to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.*

42 U.S.C § 2000e-3(a) (*Emphasis Added*).

150. Plaintiffs engaged in protected activities as further set forth above, including but not limited to reporting claims of discrimination to Department command officers, city officials, and the EEOC.

151. Defendants were well aware of Plaintiffs' protected activities in reporting their claims of discrimination.

*10.30.23 Plaintiffs' Verified Complaint and Jury Demand, p. 48*

152.   As a direct result of Plaintiffs' engagement of protected activities in reporting their discrimination claims, Defendants retaliated against Plaintiffs in the terms and conditions of their employment and by further subjection Plaintiffs to a continued hostile work environment, which included, but was not limited to:

   a.   Initiating and spreading a knowingly false and defamatory narrative aimed at undermining Plaintiffs' authority and damaging their credibility and reputation based by, accusing Plaintiffs Ross and Glasstetter of engaging in an alleged inappropriate sexual relationship;

   b.   Knowingly and falsely accusing Plaintiff Ross of copyright violations resulting in Plaintiff Ross having to hire an attorney to clear his good name;

   c.   Knowingly and falsely accusing Plaintiff Conquest of allegedly witnessing Plaintiff Ross engaging in an inappropriate sexual exchange with Plaintiff Glasstetter;

   d.   Knowingly and falsely accusing Plaintiff Conquest of blackmailing Plaintiffs Ross and Glasstetter and allegedly conspiring with them to pass a departmental detective's exam;

   e.   Knowingly and falsely accusing Plaintiff Ross of sexual harassment in the workplace;

   f.   Subjecting Plaintiffs to unauthorized police surveillance in violation of departmental policies and procedures;

   g.   Subjecting Plaintiffs to a months-long investigation into alleged wrongdoings based on the false accusations set forth above, which resulted in a finding that cleared Plaintiffs of any alleged wrongdoing or misconduct;

   h.   Subsequently knowingly and falsely accusing Plaintiffs Ross and Glasstetter of an inappropriate relationship in city council meetings; and

i.  Knowingly and falsely accusing Plaintiff Glasstetter of inappropriate conduct toward Defendant Councilwoman Connley to subject Plaintiff Glasstetter to unwarranted disciplinary action, *after* Plaintiffs engaged in a protected activity by reporting the rampant and perverse discrimination, ongoing hostile environment and continuous retaliation to the Equal Employment Opportunity Commission.

153.  As a direct and proximate result of the unconstitutional acts of the Defendants and their tortious conduct and other violations of law as alleged herein, Plaintiffs have sustained violations of their right to equal protection of the law and continue to sustain damages, including but not limited to:

a.  Economic damages such as general damages, loss of earnings and earning capacity, loss of career opportunities, value of benefits and work-related investments, and/or out-of-pocket damages;

b.  Special damages such as exemplary damages in the form of non-economic damages, which include, but are not limited to loss of goodwill, harm to reputation, loss of standing in the law enforcement community, mental and emotional distress, loss of ordinary pleasures of life, loss of confidence, sleepless nights, loss of self-esteem and confidence, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, shame, and embarrassment;

c.  Exemplary and/or punitive damages for injury not capable of precise computation resulting from Defendants' malicious actions as further outlined and set forth above;

d.  Consequential damages;

e.  Incidental damages;

f.  Applicable Statutory damages; and

g.  Special damages and/or consequential damages in the form of costs and attorney fees.

**WHEREFORE**, Plaintiffs hereby respectfully requests that this Honorable Court enter a judgment in favor of Plaintiffs and against Defendants, jointly and severally, in the total amount found to be due and owing at the time of trial, in addition to compensatory and/or punitive damages, plus court costs, statutory interest of twelve percent (12%) and actual attorney fees sustained in the case as well as any other further relief as may be deemed appropriate under the circumstances.

**COUNT III**
**VIOLATION OF 42 U.S.C. § 1983**
**FOURTEENTH AMENDMENT DUE PROCESS/ EQUAL PROTECTION VIOLATIONS**

154. Plaintiffs hereinafter incorporate by reference the above referenced Paragraphs and allegations, as though fully set forth herein.

155. Substantive due process serves the goal of preventing governmental power from being used for purposes of oppression,' regardless of the fairness of the procedures used. *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996); See also *Daniels v. Williams,* 474 U.S. 327, 331, (1986).

156. Substantive due process claims may be loosely divided into two categories:

    a.    Deprivations of a particular constitutional guarantee; and

    b.    Actions that shock the conscience.

*Pusey v. City of Youngstown,* 11 F.3d 652, 656 (6th Cir. 1993), *cert. denied,* 512 U.S. 1237 (1994).

157. The Equal Protection Clause of the Fourteenth Amendment guarantees the right to be free from discrimination on the basis of sex, race or national origin. *Poe*

*v. Hayden*, 853 F.2d 418, 429 (6th Cir. 1988); see also *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265 (1977).

158.   At all times relevant herein, Defendants intentionally discriminated against Plaintiffs based on their sex and/or national origin as further set forth above in violation of 42 U.S.C §1983.

159.   Defendants acted under color of state law to intentionally discriminate against Plaintiffs of their membership in a protected classes (i.e. sex, race, national origin). *Brand v. Motley*, 526 F.3d 921, 924 (6th Cir. 2008); See also *Henry v. Metro. Sewer Dist.*, 922 F.2d 332, 341 (6th Cir. 1990).

160.   Defendants' unlawful discrimination against Plaintiffs as more fully set forth above includes, but is not limited to, inappropriate, insulting, demeaning, stereotypical, and offensive comments, jokes, statements, conversations, and other conduct amounting to a severe and pervasive hostile and abusive work environment, adverse employment actions, and disparate treatment, which was:

   a.   Directed towards Plaintiff Glasstetter based on her sex in connection with her pregnancy;

   b.   Directed toward Plaintiff Glasstetter based on her sex in connection with the defamatory false narrative of an alleged affair between Plaintiff Ross and herself;

   c.   Directed toward Plaintiff Glasstetter based on her sex in connection with her complaint and reporting of the nepotism policy being placed in her mailbox;

d.     Directed toward Plaintiff Glasstetter based on her sex in connection with Defendants' manifest indifference and failure to address Plaintiff Glasstetter's complaint and reporting of the ongoing discrimination in a manner reasonably calculated to end the ongoing harassment by not even acknowledging or documenting or fully investigating the discrimination and harassment complaints;

e.     Directed toward Plaintiff Glasstetter based on her sex in connection with her favorable Sergeant's exam results;

f.     Directed toward Plaintiff Glasstetter based on her sex in connection with her promotion to the rank of Sergeant;

g.     Directed towards Plaintiff Conquest based on her sex in connection with her homosexual orientation;

h.     Directed towards Plaintiff Conquest based on her Asian national origin or race;

i.     Directed toward Plaintiff Conquest based on her sex in connection with Defendants' manifest indifference and failure to address Plaintiff Conquest's complaint and reporting of the ongoing discrimination in a manner reasonably calculated to end the ongoing harassment by not even acknowledging or documenting or fully investigating the discrimination and harassment complaints;

j.     Directed towards Plaintiff Conquest based on her sex in connection with her favorable Detective's exam results;

k.     Directed towards Plaintiff Ross based on his sex in connection with the defamatory false narrative of an alleged affair between Plaintiff Glasstetter and himself;

l.     Directed toward Plaintiff Ross based on his association with Plaintiffs Glasstetter and Conquest, both of whom are members of a protected class under Title VII in connection with Defendants' manifest indifference and failure to address Plaintiff Ross' complaints and reporting of the ongoing discrimination in a manner reasonably calculated to end the ongoing harassment by not even acknowledging

or documenting or fully investigating the discrimination and harassment complaints; and

m. Directed towards Plaintiff Ross in connection with his association with Plaintiffs Glasstetter and Conquest, both of whom are members of a protected class under Title VII.

161. Plaintiffs had clearly established constitutional rights under the Equal Protection Clause not to be discriminated against by Defendants on the basis of their sex, race or national origin. *See Washington v. Davis*, 426 U.S. 229 (1976); see also *Poe v. Haydon*, 853 F.2d 418, 430 (6th Cir. 1988).

162. Defendant Piazza personally violated Plaintiffs' clearly established constitutional rights as further outlined above.

163. Defendant Command Officer Jones personally violated Plaintiffs' clearly established constitutional rights as further outlined above, by his failure to supervise, control or train Defendant Piazza, command officers and other officers within the Department because he at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct thereby encouraging the discriminatory conduct and/or in some other way directly participated in it. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999); See also *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982); and *Salehpour v. Univ. of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998); and *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 513 (6th Cir. 1996).

164. Defendant Command Officer Kissel personally violated Plaintiffs' clearly established constitutional rights as further outlined above, by his failure to supervise,

control or train Defendant Piazza, command officers and other officers within the Department because he at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct thereby encouraging the discriminatory conduct and/or in some other way directly participated in it. *Id.*

165.   Defendant Haskins as the Defendant City's and the Police Department's final policy maker, personally violated Plaintiffs' clearly established constitutional rights as further outlined above, by his failure to supervise, control or train officers within the Department or members of the City Council, because he at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct thereby encouraging the discriminatory conduct and/or in some other way directly participated in it. *Id.*

166.   Defendants conduct as described above was so outrageous that it shocks the conscience of any reasonable person.

167.   As a direct and proximate result of the unconstitutional acts of the Defendants and their tortious conduct and other violations of law as alleged herein, Plaintiffs have sustained violations of their right to equal protection of the law and continue to sustain damages, including but not limited to:

  a.   Economic damages such as general damages, loss of earnings and earning capacity, loss of career opportunities, value of benefits and work-related investments, and/or out-of-pocket damages;

  b.   Special damages such as exemplary damages in the form of non-economic damages, which include, but are not limited to loss of

goodwill, harm to reputation, loss of standing in the law enforcement community, mental and emotional distress, loss of ordinary pleasures of life, loss of confidence, sleepless nights, loss of self-esteem and confidence, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, shame, and embarrassment;

c.      Exemplary and/or punitive damages for injury not capable of precise computation resulting from Defendants' malicious actions as further outlined and set forth above;

d.      Consequential damages;

e.      Incidental damages;

f.      Applicable Statutory damages; and

g.      Special damages and/or consequential damages in the form of costs and attorney fees.

**WHEREFORE**, Plaintiffs hereby respectfully requests that this Honorable Court enter a judgment in favor of Plaintiffs and against Defendants, jointly and severally, in the total amount found to be due and owing at the time of trial, in addition to compensatory and/or punitive damages, plus court costs, statutory interest of twelve percent (12%) and actual attorney fees sustained in the case as well as any other further relief as may be deemed appropriate under the circumstances.

## COUNT IV
### VIOLATION OF 42 U.S.C. § 1983
### MONELL LIABILITY AGAINST DEFENDANT CITY OF BURTON

168.    Plaintiffs hereinafter incorporate by reference the above referenced Paragraphs and allegations, as though fully set forth herein.

*10.30.23 Plaintiffs' Verified Complaint and Jury Demand, p. 56*

169.   The Equal Protection Clause of the Fourteenth Amendment guarantees the right to be free from discrimination on the basis of sex, race or national origin. *Poe v. Hayden*, 853 F.2d 418, 429 (6th Cir. 1988); see also *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265 (1977).

170.   At all times relevant herein, Defendants intentionally discriminated against Plaintiffs based on their sex and/or national origin as further set forth above.

171.   At all times relevant herein, Defendant City, by and through the Police Department, maintained a series of policies, customs, and practices which individually and collectively constituted a moving force in the constitutional violations asserted herein, including but not limited to:

    a.    Policy, custom, and/or practice of direct humiliating, outrageous, sexist, and belittling antagonism, discrimination, retaliation towards members of protected classes, such as minorities, members of the LGBTQ community, and/or female officers with the Department;

    b.    Policy, custom, and/or practice of direct humiliating, outrageous, and belittling antagonism, discrimination, retaliation towards individuals who have an association with members of protected classes, such as minorities, members of the LGBTQ community, and/or female officers with the Department;

    c.    Policy, custom, and/or practice of a failure, amounting to refusal to address known complaints of discriminatory and retaliatory actions and remarks by its officers directed toward members of protected classes, such as minorities, members of the LGBTQ community, and/or female officers with the Department;

    d.    Policy, custom, and/or practice of a failure, amounting to refusal to address known complaints of discriminatory and retaliatory actions and remarks by its officers directed at individuals who have an association

with members of protected classes, such as minorities, members of the LGBTQ community, and/or female officers with the Department;

e.      Policy, custom, and/or practice of a failure, amounting to refusal to address known complaints of discriminatory and retaliatory actions and remarks by its officers regarding rumors of discriminatory stereotypes regarding members of protected classes, such as minorities, members of the LGBTQ community, and/or female officer and their advancement and role in the workplace;

f.      Policy, custom, and/or practice of a failure, amounting to refusal to address known complaints of discriminatory and retaliatory actions and remarks by its officers regarding rumors of sex and gender-based stereotypes regarding women's advancement and role in the workplace;

g.      Policy, custom, and/or practice of a failure, amounting to refusal to investigate and/or document complaints of discriminatory and retaliatory actions and remarks by its officers directed at members of protected classes, such as minorities, members of the LGBTQ community, and/or female officers with the Department;

h.      Policy, custom, and/or practice of a failure, amounting to refusal to discipline its officers for humiliating, outrageous, sexist, and belittling antagonism, discrimination, retaliation towards members of protected classes, such as minorities, members of the LGBTQ community, and/or female officers with the Department;

i.      Policy, custom, and/or practice of a failure, amounting to refusal to discipline its officers for engaging in discriminatory or retaliatory behavior;

j.      Policy, custom, and/or practice of a failure, amounting to refusal to enforce policies and procedures for the reporting of discrimination, harassment, hostile work environment and retaliation;

k.      Policy, custom, and/or practice of a failure, amounting to refusal to enforce grievance procedures, investigation procedures, disposition procedures, disciplinary action, and training in connection with

employment discrimination, harassment, hostile work environment and retaliation.

l.     Policy, custom, and/or practice of a failure to train its officers regarding humiliating, outrageous, sexist, and belittling antagonism, discrimination, retaliation towards members of protected classes, such as minorities, members of the LGBTQ community, and/or female officers with the Department;

m.    Policy, custom, and/or practice of a failure to train its officers regarding humiliating, outrageous, sexist, and belittling antagonism, discrimination, retaliation towards individuals who have an association with members of protected classes, such as minorities, members of the LGBTQ community, and/or female officers with the Department;

n.     Policy, custom, and/or practice of a failure to train its officers regarding rumors of discriminatory stereotypes regarding members of protected classes, such as minorities, members of the LGBTQ community, and/or female's advancement and role in the workplace;

o.     Policy, custom, and/or practice of a failure to train its officers regarding rumors of sex stereotypes regarding women's advancement and role in the workplace;

p.     Policy, custom, and/or practice of a failure to train its officers regarding the mandatory requirement that discriminatory and/or retaliatory actions are inexcusable and will be responded to with discipline;

q.     Policy, custom, and/or practice of a failure to train its officers regarding the use of hostile statements and verbalisms directed toward minorities, members of the LGBTQ community, and women;

172.   These above referenced widespread policies, customs, and/or practices by Defendant City when enforced caused Plaintiffs' constitutional violations. *McTigue v. City of Chi.*, 60 F.3d 381 (7th Cir. 1995); See also *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989); and *Doe v. Claiborne County, Tenn.*, 103 F.3d 495 (6th Cir.

1996); and *McCoy v. Bd. of Educ., Columbus City Sch.*, 515 F. App'x 387, 393 (6th Cir. 2013); and *Soles v. Ingham County*, 316 F. Supp. 2d 536, 544-45 (W.D. Mich. 2004), aff'd, 148 F. App'x 418 (6th Cir. 2005); and *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. (1977).

173.  These widespread policies, customs, and/or practices by Defendant City, while not authorized by written law or express municipal policy, constitute a custom or usage with the force of law.  *Id.*

174.   Plaintiff Ross specifically advised Defendant Haskins of the ongoing discrimination and retaliation on multiple occasions, which knowledge was imputed to Defendant City, and for which there was no response or corrective action taken.

175.  These widespread policies, customs, and/or practices constitute injury by Defendant Haskins, who as the mayor is the final policymaking authority for Defendant City. *Id.*

176.  These customs, policies, and practices by Defendant City and Defendant Haskins, when enforced, were a moving force in the constitutional violations inflicted by the Individual Defendants upon Plaintiffs, as set forth above. *Id.*

177.   As a direct and proximate result of the unconstitutional acts of the Defendants and their tortious conduct and other violations of law as alleged herein, Plaintiffs have sustained violations of their right to equal protection of the law and continue to sustain damages, including but not limited to:

a.     Economic damages such as general damages, loss of earnings and earning capacity, loss of career opportunities, value of benefits and work-related investments, and/or out-of-pocket damages;

b.     Special damages such as exemplary damages in the form of non-economic damages, which include, but are not limited to loss of goodwill, harm to reputation, loss of standing in the law enforcement community, mental and emotional distress, loss of ordinary pleasures of life, loss of confidence, sleepless nights, loss of self-esteem and confidence, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, shame, and embarrassment;

c.     Exemplary and/or punitive damages for injury not capable of precise computation resulting from Defendants' malicious actions as further outlined and set forth above;

d.     Consequential damages;

e.     Incidental damages;

f.     Applicable Statutory damages; and

g.     Special damages and/or consequential damages in the form of costs and attorney fees.

**WHEREFORE**, Plaintiffs hereby respectfully requests that this Honorable Court enter a judgment in favor of Plaintiffs and against Defendants, jointly and severally, in the total amount found to be due and owing at the time of trial, in addition to compensatory and/or punitive damages, plus court costs, statutory interest of twelve percent (12%) and actual attorney fees sustained in the case as well as any other further relief as may be deemed appropriate under the circumstances.

## STATE LAW CLAIMS

### COUNT V
### VIOLATION OF ELCRA, MCL 37.2101, *ET SEQ.*
### DISCRIMINATION BASED ON SEX AND NATIONAL ORIGIN

178.  Plaintiffs hereinafter incorporate by reference the above referenced

Paragraphs and allegations, as though fully set forth herein.

179.  At all times relevant herein, there was in effect the Michigan Elliott-Larson

Civil Rights Act, MCL 37.2101, et seq. ("ELCRA") which provides:

(1) An employer shall not do any of the following:

(a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.

(b) Limit, segregate, or classify an employee or applicant for employment in a way that deprives or tends to deprive the employee or applicant of an employment opportunity, or otherwise adversely affects the status of an employee or applicant because of religion, race, color, national origin, age, sex, height, weight, or marital status.

(c) Segregate, classify, or otherwise discriminate against a person on the basis of sex with respect to a term, condition, or privilege of employment, including, but not limited to, a benefit plan or system.

(d) Treat an individual affected by pregnancy, childbirth, or a related medical condition differently for any employment-related purpose from another individual who is not so affected but similar in ability or inability to work, without regard to the source of any condition affecting the other individual's ability or inability to work. For purposes of this subdivision, a medical condition related to pregnancy or childbirth does not include nontherapeutic abortion not intended to save the life of the mother.

MCL 37.2202

*10.30.23 Plaintiffs' Verified Complaint and Jury Demand, p. 62*

180.   Discrimination based on sex is unlawful and prohibited under ELCRA. MCL 37.2201(d) and 37.2202.

181.   Discrimination based on pregnancy is considered a form of sex discrimination and is therefore unlawful and prohibited under ELCRA. MCL 37.2201(d) and 37.2202.

182.   Discrimination based on sexual orientation is considered a form of sex discrimination and is therefore unlawful and prohibited under ELCRA.  *Rouch World, LLC et al. v. Department of Civil Rights et al.*, No. 162482 (July 28, 2022).

183.   Discrimination because of sex includes sexual harassment. MCL 37.2103(k)

184.   Sexual harassment means and encompasses conduct or communication of a sexual nature, where the conduct or communication has the purpose or effect of substantially interfering with an individual's employment or creating an intimidating, hostile, or offensive employment environment. MCL 37.2103(k).

185.   At all times relevant herein, Defendant City was Plaintiffs' employer as covered by and within the meaning of the ELCRA. MCL 37.2201.

186.   At all times relevant herein, Individual Defendants were employed by Defendant City or were otherwise agents or representatives of Defendant City as defined under the ELCRA. MCL 37.2201.

187.   At all times relevant herein, Plaintiffs were employed by Defendant City as defined under the ELCRA. MCL 37.2201.

*10.30.23 Plaintiffs' Verified Complaint and Jury Demand, p. 63*

188.   Plaintiffs are members of protected classes under ELCRA and were subjected to a hostile and abusive environment, adverse employment actions, and disparate treatment based on their protected class status as further outlined above.

189.   As a direct and proximate result of the unconstitutional acts of the Defendants and their tortious conduct and other violations of law as alleged herein, Plaintiffs have sustained violations of their right to equal protection of the law and continue to sustain damages, including but not limited to:

    a.    Economic damages such as general damages, loss of earnings and earning capacity, loss of career opportunities, value of benefits and work-related investments, and/or out-of-pocket damages;

    b.    Special damages such as exemplary damages in the form of non-economic damages, which include, but are not limited to loss of goodwill, harm to reputation, loss of standing in the law enforcement community, mental and emotional distress, loss of ordinary pleasures of life, loss of confidence, sleepless nights, loss of self-esteem and confidence, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, shame, and embarrassment;

    c.    Exemplary and/or punitive damages for injury not capable of precise computation resulting from Defendants' malicious actions as further outlined and set forth above;

    d.    Consequential damages;

    e.    Incidental damages;

    f.    Applicable Statutory damages; and

    g.    Special damages and/or consequential damages in the form of costs and attorney fees.

**WHEREFORE**, Plaintiffs hereby respectfully requests that this Honorable Court enter a judgment in favor of Plaintiffs and against Defendants, jointly and severally, in the total amount found to be due and owing at the time of trial, in addition to compensatory and/or punitive damages, plus court costs, statutory interest of twelve percent (12%) and actual attorney fees sustained in the case as well as any other further relief as may be deemed appropriate under the circumstances.

**COUNT VI**
**VIOLATION OF ELCRA, MCL 37.2101, *ET SEQ.***
**RETALIATION**

190.  Plaintiffs hereinafter incorporate by reference the above referenced Paragraphs and allegations, as though fully set forth herein.

191.  The ELCRA prohibits discrimination or retaliation against a person "because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding or hearing under this act." MCL 37.2701(a).

192.  At all times relevant herein, Defendant City was Plaintiffs' employer as covered by and within the meaning of the ELCRA. MCL 37.2201.

193.  At all times relevant herein, Individual Defendants were employed by Defendant City or were otherwise agents or representatives of Defendant City as defined under the ELCRA. MCL 37.2201.

194.  At all times relevant herein, Plaintiffs were employed by Defendant City as

defined under the ELCRA. MCL 37.2201.

195.   Plaintiffs engaged in activities protected under the ELCRA when they reported the discriminatory conduct, sex discrimination and hostile environment to which they were subjected, as outlined above.

196.   After Plaintiffs engaged in the protective activities as outlined above, they were subjected to severe or pervasive retaliatory harassment by her Individual Defendants as further outlined above.

197.   The adverse employment actions or severe and pervasive retaliatory harassment that Plaintiffs endured was the direct result of Plaintiffs' protected activities under ELCRA.

198.   As a direct and proximate result of the unconstitutional acts of the Defendants and their tortious conduct and other violations of law as alleged herein, Plaintiffs have sustained violations of their right to equal protection of the law and continue to sustain damages, including but not limited to:

   a.   Economic damages such as general damages, loss of earnings and earning capacity, loss of career opportunities, value of benefits and work-related investments, and/or out-of-pocket damages;

   b.   Special damages such as exemplary damages in the form of non-economic damages, which include, but are not limited to loss of goodwill, harm to reputation, loss of standing in the law enforcement community, mental and emotional distress, loss of ordinary pleasures of life, loss of confidence, sleepless nights, loss of self-esteem and confidence, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, shame, and embarrassment;

    c.        Exemplary and/or punitive damages for injury not capable of precise computation resulting from Defendants' malicious actions as further outlined and set forth above;

    d.        Consequential damages;

    e.        Incidental damages;

    f.        Applicable Statutory damages; and

    g.        Special damages and/or consequential damages in the form of costs and attorney fees.

**WHEREFORE**, Plaintiffs hereby respectfully requests that this Honorable Court enter a judgment in favor of Plaintiffs and against Defendants, jointly and severally, in the total amount found to be due and owing at the time of trial, in addition to compensatory and/or punitive damages, plus court costs, statutory interest of twelve percent (12%) and actual attorney fees sustained in the case as well as any other further relief as may be deemed appropriate under the circumstances.

### COUNT VII
### VIOLATION OF MCL 600.2911
### DEFAMATION AND DEFAMATION PER SE

199.  Plaintiffs hereinafter incorporate by reference the above referenced Paragraphs and allegations, as though fully set forth herein.

200.  Individual Defendants published remarks about Plaintiffs to third parties with knowledge of the falsity of the statements or in reckless disregard of their truth or falsity, and with the intent to cause reputational harm, which remarks included, but were not limited to:

*10.30.23 Plaintiffs' Verified Complaint and Jury Demand, p. 67*

a.   Defendant Piazza knowingly and falsely claiming to others that Plaintiffs Ross and Glasstetter were "sexting" each other;

b.   Defendant Command Officer Jones and another sergeant knowingly and falsely claiming to others that Plaintiff Glasstetter was cheating on her husband, Cameron, with Plaintiff Ross;

c.   Defendant Command Officers Jones and Kissel knowingly and falsely claiming to others that Plaintiff Ross switched the eligibility requirements solely to promote Plaintiff Glasstetter to the rank of sergeant;

d.   Defendant Command Officers Jones and Kissel knowingly and falsely claiming to others that Plaintiff Ross provided Plaintiff Glasstetter the books, exam questions, and other resources in order to help her pass the exam;

e.   Defendant Command Officers Jones and Kissel knowingly and falsely claiming to others that Plaintiff Conquest allegedly witnessed Plaintiff Ross engaging in an inappropriate sexual exchange with Plaintiff Glasstetter;

f.   Defendant Command Officers Jones and Kissel knowingly and falsely claiming to others that Plaintiff Conquest allegedly blackmailed Plaintiffs Ross and Glasstetter to obtain a promotion to the rank of detective;

g.   Defendant Command Officers Jones and Kissel knowingly and falsely claiming to others that Plaintiff Conquest allegedly conspired with Plaintiffs Ross and Glasstetter to ensure that she would pass the detective's exam;

h.   Defendant Command Officers Jones and Kissel knowingly and falsely claiming to others that Plaintiff Conquest allegedly cheated on the detective's exam because she scored 84% on the test and was in the top 3 of all the candidates that took the exam;

i.   Defendant Command Officers Jones and Kissel knowingly and falsely claiming to others that Plaintiff Ross had sexually harassed him and/or Plaintiff Glasstetter;

j.   Defendant Command Officers Jones and Kissel knowingly and falsely claiming to others that Plaintiff Ross secretly went on vacation to Tennessee with Plaintiff Glasstetter and Plaintiff Conquest;

k.   Defendant BCOG knowingly and falsely claiming to others that the BCOG membership has *unanimously approved* a Vote of No Confidence in Burton Police Chief Brian Ross;"

l.   Defendant Conley knowingly and falsely claiming to others that Plaintiff Ross and Glasstetter were having an affair; and

Defendant Conley knowingly and falsely stating in an open City Council meeting that she believed Defendant Jones that Plaintiffs Ross and Glasstetter were engaged in alleged sexual relationship.

201.   Indeed, Individual Defendants published these remarks to third parties with knowledge of the falsity of the statements or in reckless disregard of their truth or falsity as these remarks were blatantly untrue and completely false.

202.   Individual Defendants published these remarks to third parties with malice and the specific and intentional purpose to undermine Plaintiffs' authority and credibility and disparage and tarnish their reputations and good names in the community.

203.   Individual Defendants' publication of these false remarks to third parties was not privileged.

204.   Individual Defendants' publication of these false remarks constitute defamation per se.  See *Burden v Elias Bros Big Boy Restaurants*, 240 Mich App 723; 613 NW2d 378 (2000).

205.   As a direct and proximate result of Defendants' unlawful actions, tortious conduct and other violations of law, Plaintiffs have and continue to sustain damages, including but not limited to:

    a.   Economic damages such as general damages, loss of earnings and earning capacity, loss of career opportunities, value of benefits and work-related investments, and/or out-of-pocket damages;

    b.   Special damages such as exemplary damages in the form of non-economic damages, which include, but are not limited to loss of goodwill, harm to reputation, loss of standing in the law enforcement community, mental and emotional distress, loss of ordinary pleasures of life, loss of confidence, sleepless nights, loss of self-esteem and confidence, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, shame, and embarrassment;

    c.   Exemplary and/or punitive damages for injury not capable of precise computation resulting from Defendants' malicious actions as further outlined and set forth above;

    d.   Consequential damages;

    e.   Incidental damages;

    f.   Applicable Statutory damages; and

    g.   Special damages and/or consequential damages in the form of costs and attorney fees.

**WHEREFORE**, Plaintiffs hereby respectfully requests that this Honorable Court enter a judgment in favor of Plaintiffs and against Defendants, jointly and severally, in the total amount found to be due and owing at the time of trial, in addition to compensatory and/or punitive damages, plus court costs, statutory

interest of twelve percent (12%) and actual attorney fees sustained in the case as well as any other further relief as may be deemed appropriate under the circumstances.

## COUNT VIII
### INTENTIONAL INFLICTION OF MENTAL AND EMOTIONAL DISTRESS

206. Plaintiffs hereinafter incorporate by reference the above referenced Paragraphs and allegations, as though fully set forth herein.

207. Defendants' conduct as outlined above was intentional.

208. Defendants' conduct as outlined above was extreme, outrageous, and of a character not to be tolerated by a civilized society.

209. Defendants' conduct as outlined above was for an ulterior motive or purpose.

210. Defendants' conduct resulted in severe and serious emotional distress.

211. As a direct and proximate result of Defendants' unlawful actions, tortious conduct and other violations of law, Plaintiffs have and continue to sustain damages, including but not limited to:

    a.    Economic damages such as general damages, loss of earnings and earning capacity, loss of career opportunities, value of benefits and work-related investments, and/or out-of-pocket damages;

    b.    Special damages such as exemplary damages in the form of non-economic damages, which include, but are not limited to loss of goodwill, harm to reputation, loss of standing in the law enforcement community, mental and emotional distress, loss of ordinary pleasures of life, loss of confidence, sleepless nights, loss of self-esteem and confidence, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, shame, and embarrassment;

c.   Exemplary and/or punitive damages for injury not capable of precise computation resulting from Defendants' malicious actions as further outlined and set forth above;

d.   Consequential damages;

e.   Incidental damages;

f.   Applicable Statutory damages; and

g.   Special damages and/or consequential damages in the form of costs and attorney fees.

**WHEREFORE**, Plaintiffs hereby respectfully requests that this Honorable Court enter a judgment in favor of Plaintiffs and against Defendants, jointly and severally, in the total amount found to be due and owing at the time of trial, in addition to compensatory and/or punitive damages, plus court costs, statutory interest of twelve percent (12%) and actual attorney fees sustained in the case as well as any other further relief as may be deemed appropriate under the circumstances.

Respectfully Submitted,

    /s/ Muneeb M. Ahmad
AHMAD & AKBAR LAW, PLLC
Muneeb M. Ahmad (P70391)
Attorneys for Plaintiffs
811 North Main Street, Suite 301
Royal Oak, MI 48067
T. 248-519-2313
F. 248-519-2399
Muneeb@ahmadandakbar.com

Dated: October 30, 2023

*10.30.23 Plaintiffs' Verified Complaint and Jury Demand, p. 72*

## <u>PLAINTIFF'S VERIFICATION OF FACTUAL ALLEGATIONS</u>

I BRIAN ROSS, individually, hereby state and depose that I have fully read the Verified Complaint in this matter and that I know the matters set forth herein to be true and correct, except those written upon information and belief, and as to those matters, I believe them to be true.

<u>/s/ Brian Ross</u>                        10/30/2023
        BRIAN ROSS


I FARAH GLASSTETTER, individually, hereby state and depose that I have fully read the Verified Complaint in this matter and that I know the matters set forth herein to be true and correct, except those written upon information and belief, and as to those matters, I believe them to be true.

<u>/s/ Farah Glasstetter</u>                  10/30/2023
        FARAH GLASSTETTER

I SARAH CONQUEST, individually, hereby state and depose that I have fully read the Verified Complaint in this matter and that I know the matters set forth herein to be true and correct, except those written upon information and belief, and as to those matters, I believe them to be true.

<u>/s/ Sarah Conquest</u>                    10/30/2023
        SARAH CONQUEST

## UNITED STATES DISTRICT COURT EASTERN DISTRICT OF MICHIGAN SOUTHERN DIVISION

BRIAN ROSS, an Individual,
FARAH GLASSTETTER, an Individual, and
SARAHCONQUEST, an Individual

                                         Plaintiffs,

v.

CITY OF BURTON, a Governmental Entity
POLICE OFFICERS LABOR COUNCIL –
BURTON CITY COMMAND OFFICERS,
POLICE OFFICERS LABOR COUNCIL –
BURTON PATROL OFFICERS,
DUANE HASKINS, in his Official Capacity Only
TINA CONLEY, KEVIN JONES,
KEVIN KISSEL and DANA PIAZZA,
in their Individual and Official Capacities,
Jointly and severally.

                                        Defendants.

Case No: 2:23-cv-12754
Honorable:
Magistrate:

_____

MUNEEB M. AHMAD (P70391)
SYED HUSSAIN AKBAR (P67967)
AHMAD & AKBAR LAW, PLLC
Attorneys for Plaintiffs
811 N. Main Street, Suite 106
Royal Oak, MI 48067-1825
Tel. (248) 519-2313
Fax: (248) 519-2399

_____

## PLAINTIFFS' JURY DEMAND
_____

**NOW COME**, Plaintiffs BRIAN ROSS, an Individual, FARAH GLASSTETTER, an Individual, and SARAH CONQUEST, an Individual by and through their undersigned counsel, AHMAD & AKBAR LAW, PLLC, and for their Complaint against Defendants CITY OF BURTON, a Municipal Corporation, POLICE OFFICERS LABOR COUNCIL–BURTON CITY COMMAND OFFICERS, a Labor Union, POLICE OFFICERS LABOR COUNCIL–BURTON PATROL OFFICERS, a Labor Union, DUANE HASKINS, Mayor of the City of Burton, in his Official Capacity Only, TINA CONLEY, a City Councilwoman for the City of Burton, in her Individual and Official Capacity, KEVIN JONES, a Police Officer for the City of Burton, in his Individual and Official Capacity, KEVIN KISSEL, a Police Officer for the City of Burton, in his Individual and Official Capacity, and DANA PIAZZA, a Police Officer for the City of Burton, in her Individual and Official Capacity, Jointly and Severally, hereby demand a trial by jury in this instant action.

Respectfully Submitted,

/s/ Muneeb M. Ahmad
AHMAD & AKBAR LAW, PLLC
Muneeb M. Ahmad (P70391)
Attorneys for Plaintiffs
811 North Main Street, Suite 301
Royal Oak, MI 48067
T. 248-519-2313
F. 248-519-2399
Dated: October 30, 2023                     Muneeb@ahmadandakbar.com

*10.30.23 Plaintiffs' Verified Complaint and Jury Demand, p. 75*